Good morning ladies and gentlemen. Our first case of the morning is agenda number 12-116-005. People ex rel Lisa Madigan et cetera et al. versus the Illinois Commerce Commission. Are you ready to proceed? Good morning your honors, counsel. May it please the court. I am Brett Lagner with the Illinois Attorney General's office and I represent the people ex rel. the Attorney General in this matter. Your honors, Rider VBA, the revenue decoupling rider, which permits the utilities in this case to impose surcharges or refunds on gas delivery services over a year after those services have been delivered. Unpermissible under one, the rate making principle set forth in the Public Utilities Act. Two, under the principle that prohibits retroactive rate making. And three, under the principle that prohibits single issue rate making under Illinois utility law. At the outset, it's important to note that Rider VBA is an exceptional and drastic revenue recovery mechanism that before now, before this case, has not been known in Illinois rate regulation. In fact, these two utility companies, these two gas First, the Public Utilities Act provides for rate of return regulation based on a test year. Utilities present evidence and data on their operating costs, plant investment, forecast consumer usage, weather patterns, et cetera, a multitude of different variables. Based on this, the commission, after the rate hearing, designs a rate to allow the utilities to recover their costs and to prevent them a certain profit, a designated profit, a return on their investment. This is their rate of return. As part of this process, gas delivery rates are set for consumer classes and thus rates are published under sections 9-102 and 9-104 of the Public Utilities Act. In making this rate design and approving the customer rates, the commission must seek to achieve least cost rates and that's under section 1-102A of the Public Utilities Act. This process is supposed to approximate what a company may earn in the free market. This process gives the company an opportunity to receive a profit, but it does not guarantee a profit. It places the risk on the company and in fact, the risk on that the company bears is factored into the profit that is allowed. The greater the risk, the more profit that's going to be allowed. That's factored into the rate of return. But right of VBA changes that and moves the risk from the utilities to the utilities residential and small business customers. It guarantees utilities, it guarantees that utilities receive a certain revenue, a certain revenue stream from those customer bases. Mr. Legner, is it true? I mean, you would claim from the appellee's brief that the country as a whole is moving in the direction of riders like the rider VBA in this instance. Is that true or not? Other states have implemented riders like rider VBA. That is true. It is still many states do not have it. Many states have not chosen to go that route. But it's also important to point that of the states that do have riders VBA, generally those are pursuant to statutory amendments. The rate regulation statutes are amended to specifically allow this type of rider. Basically in recognition that it's not consistent with traditional rate making, rate of return regulation. Or alternatively, those states that have adopted a rider VBA do so in essentially in a settlement with utility companies in exchange for efficiency promises. Neither of those cases have happened here. With regard to the efficiency, isn't the idea behind the rider to provide an incentive for the utilities to control their costs and operate efficiently, which really is truly in the public interest? It is. No. The commission found that that was not, that energy efficiency was not a goal to be achieved by the rider VBA. And in fact, the efficiency requirements, the General Assembly already has efficiency requirements in the Public Utility Act at section 8-401. So rider VBA is not necessary to achieve that. Then you're saying that the utility rates are always subject to some sort of regulation and review, even without the rider. Absolutely. Well, I mean, they're subject to regulation and review as they are set prospectively. But under the rate making procedure set forth under the Public Utilities Act, companies come in, present a test year case, either based on a historic year or a projected future year, and rates are set going forward, prospectively. If in the end those rates are inadequate, there's some problem with that, something changes, the Public Utilities Act provides the answer there, too. And that's section 9-201, which says you come in and open up a new rate case. It doesn't say you get to go back and charge consumers more because they use less gas. And that's exactly what rider VBA does. Well, how does the average consumer, how is that he or she affected by the rider? The average consumer is affected by the rider in this sense. If at the end of the year, the utilities did not achieve the revenue requirement from the consumer, from the residential class or from the small business class, they're allowed then over the next year, between April and December, to impose a monthly surcharge on those classes to make up the revenue that they didn't get the year before. So in other words, if consumers in 2013 conserve gas, conserve energy, conserve gas, don't use as much gas, and as a result, the utilities don't meet their projected revenue requirement, then in 2014, the utilities get to impose a surcharge on those people who conserve gas in 2013 to make up for the lost revenue. So there's no incentive to conserve gas? There's no incentive to conserve gas for the consumers. That's absolutely true. And the utilities claim that, well, with rider VBA, they don't have an incentive to promote the use of gas. But again, that's a red herring because there's already a separate efficiency statute under the Public Utilities Act that requires, that places efficiency requirements on the utility companies. To be sure, there's other things to consider rather than practicalities, but should we be influenced at all by the fact that utilities want it, consumers seem to be benefiting from it, and environmental groups are in favor of it? No. The mere fact that utilities want it certainly isn't enough to satisfy, like, the principles of rate making. Rate making is certainly a very contested process where utilities ask for a whole lot of rates, and other groups come and say no, give them very little rates, and something happens in the middle, as it should, as it should, after extensive evidence and hearings and presentations. But again, the fact that environmental groups, like rider VBA, is often because it's done in conjunction in a sort of settlement, like as a quid pro quo with states, for energy efficiencies in return. But Illinois separately requires that under the Public Utilities Act, so in that sense, it's not required. And it's not necessarily true that customers like rider VBA. There are years when customers don't use much gas when there are mild winters, then customers are going to have to pay surcharges the following year, even though they didn't use as much gas. And on top of that, when customers make their decision in 2013, rates under the Public Utilities Act have to be published. That way, they're supposed to be publicly understandable. That way the public knows, okay, I'm going to keep my house up to 84 degrees. I would expect to use this much gas, and this is the rate that I would pay. But under rider VBA, that goes out the window, because that rate will retroactively, effectively change via the surcharges. So that's not good for consumers. It takes away any type of certainty, and it takes away their ability to make a reasoned determination on whether they should conserve gas based on gas prices, because they may be charged more later for the fact that they did conserve. But whether this is good policy or not is not an issue before this Court. So I have a question to ask you about precedent, which cases we should be looking at. But before I ask that specific question, help me understand if I'm, if it's correct what the issues are in this case. In other words, it has been argued that rate making is a two-step process. The first step is to determine the revenue requirement, and the second step is to fashion a rate to collect that revenue requirement. And then here, what's going on is that second prong where there was a decoupling of revenue from usage. And it has been argued that you are not debating that first step, determining what the revenue requirement is. Your arguments are aimed at specifically the second aspect of rate making, that being designing rates to collect what has been determined to be an appropriate revenue requirement. Is that correct? Correct. Okay. Now, you've cited a lot of cases, and many of them seem to be about the first step, determining revenue requirements and what has to go into that. So I'm going to ask you, what specifications should we be looking at that can guide this Court's decision in terms of that second step, of whether or not this style, this process, this type of rate to collect revenue requirement, in fact, is appropriate or not, or legal or not? Sure. My first answer is, aside from cases, the plain language of the Public Utilities Act and the various provisions provided for in there that require prospective rates, that require published rates, that require publicly understandable and least-cost rates, and that provide for opening a new rate case to solve the problem of what happens when revenues are falling short. That's the first answer. The second answer, then, is on the retroactive rate-making charge. This Court's BPI-1 case and the Illinois Bell case specifically discuss the fact that refunds, after rates have been set and paid, refunds, after rates have been set, are inconsistent with prospective rate-making. It's argued that those cases are really focused on the first problem. That is, that the original determination of the revenue requirement was wrong. And so, therefore, to right the ship, later on, there have to be these either surcharge or refunds. That is, if the problem was that the first step, the revenue, the determination of what is the appropriate revenue requirement. And you're saying, in this case, you're not debating whether or not the original determination of revenue requirement was correct or not. There is no, but there's no reasoned distinction between the two circumstances. In other words, whether the retroactive rate-making analysis applies to look at the overall revenue requirement or whether it looks to a situation in which rates are changed retroactively to ensure this particular revenue stream that's a sub-part of the revenue requirement, the rationale, the theory behind the prohibition for retroactive rate-making applies equally to both situations. There's no meaningful distinction between the two. At their rate-making core, they're the same thing because they both have the effect of changing rates after they're paid. And, similarly, going third, the third answer to your question is under the single-issue rate-making question, basically the appellate court's ComEd decision and then the Petro-Mannigan decision that set forth the test for when riders are permissible would guide this court's decision. So returning to my prior point, so as I said, the Public Utilities Act requires that the Commission act to achieve least-cost rates. The focus, though, under Rider-VBA is no longer on least-cost rates. Instead, when revenues from these customer classes fall short, the Commission is imposing surcharges on them. Instead of what normally happens under the guidelines set forth by traditional rate-making, which is if customer revenues fall short, then the company needs to achieve efficiency or make other business determinations to make up for that so that it can still achieve its profit level. That's what happens in the free market, which is specifically what is supposed to be approximated in this case. Companies don't get to go back and say, well, at the end of the year, we didn't make enough money, so we're going to go ahead and charge you five extra dollars for that notebook you bought. It doesn't work like that in the free market. It shouldn't work like that as an agency sponsor, as a government-sponsored tool in rate-making. It's inconsistent with the basic principles underlying the rate-making procedure that the General Assembly has chosen, requiring prospective rates, prohibiting retroactive rates, requiring the companies to bear the risk of achieving, in the end, the rate of return. Again, the purpose of the Act is not to guarantee a profit. The purpose is to say, this is an allowable profit that will factor in when we approve your variable equation falls short, then it's incumbent upon the companies to change the other variables to make up for that shortfall. Here, however, and in fact, because of the risk, because there is a risk that consumer usage may fall short, that is factored in and built into the allowable profit level that companies are given as part of the rate-making process. But now under Rider VBA, that risk is removed, even though companies have already been compensated for it by being allowed more profit, that risk is then removed and the burden is placed entirely on the consumer classes that are subject to the Rider. Rate-making has happened under this statute and under these principles for over a century without Rider VBA for a reason. It is inconsistent with the basic nature of these principles. Rider VBA, in addition, is a violation of the A company cannot set a rate or they cannot get a rate set and then engage in a post hoc review to determine if allowances were exceeded or not met and then adjust it. Now, this is, the employees are arguing that this argument has been forfeited because it wasn't raised in the petition for re-hearing. They are arguing that, yes. Since your time is short, could you address that? Absolutely. I have four principal responses to that. First is that the retroactive rate-making challenge to Rider VBA was raised explicitly in the, when the pilot program, this concerns the permanent program, when the pilot program was approved. And the commission explicitly rejected. As a result, because the commission had explicitly rejected the retroactive rate-making challenge to Rider VBA once, it essentially is futile. And that's a well-established exception from Castaneda, among others, which is cited in our reply brief. Two is, there's no surprise to the Commerce Commission or the utilities of this challenge. Again, for the same reason that it is, it has already been raised and vetted before the commission and the commission has already opined on it. So insofar as the forfeiture waiver rule works to prevent surprise to the other party, there can be no claim of surprise here. Third is, this is a pure legal issue. So it's not something like whether Rider VBA is permissible under rate-making principles and under retroactivity and under single-issue rate-making. These are pure legal issues that are not something that's solely within the province of an agency's expertise and its fact-finding. And fourth, finally, just as the appellate court did, this court should excuse any waiver because of the importance of this issue and the importance of having an illegal rate mechanism, a revenue recovery mechanism going forward. Turning to the merits of the retroactivity question, this court has held that providing refunds when earnings are too high violates the principle. That's the BPI 1 case. The appellate court has said that retroactive refunds that alter rates fall within, this is the Illinois Bell case, fall within the retroactive rate-making prohibition. This case, the retroactive surcharges or refunds have the effect of altering the rates. They change how much these customer classes have paid for the gas delivery service they got in the prior year. Turning to the single-issue rate-making prohibition briefly, riders are single-issue rated. There's no dispute about that. But generally, the prohibition against single-issue rate-making recognizes the interconnectedness that when something falls short, perhaps something else also drops. For instance, costs drop. If customer usage drops, then perhaps their operating costs drop. Or alternatively, they can change something to make up their revenues. And that's part of the long equation and the many factors that are figured into the rate design in the first place. When you start afterwards, isolating one part of it, it throws off the equation. It distorts the rate-making process. And so for the reasons set forth in the brief, the ComEd test applies to this, and they fail both prongs of that. For these reasons, Your Honors, if there's no further questions, we ask that you please reverse the decision of the Commission. Thank you very much. Good morning, Your Honors. May it please the Court. John P. Kelleher, Special Assistant Attorney General on behalf of the Illinois Commerce Commission. I'm sharing my time with Mr. Idoukas of Foley and Lardner, who's going to be arguing on behalf of the utilities. We've attempted to divide our argument up so I would concentrate more on the retroactive rate-making issues and Mr. Idoukas on the single-issue rate-making issues. But I would like to point out a few things. I think you've accurately identified that many of the cases that they're citing for how the Commission is supposed to set rates are cases that relate to the revenue requirement. No one's taking issue with the revenue requirement in this case. All the kinds of decisions, those nuts and bolts decisions that occur to do the revenue requirement when the accountants and the engineers and the financial people decide what the operating revenues are supposed to be and then decide what the capital structure is supposed to be and then figure out what the appropriate rates of return for long- and short-term debt and all that. That's all been decided. That's not an issue here. That's the revenue requirement. Okay. What then happens is economists come in with cost studies, embedded cost of service studies, and they say these are the nature of these costs. There's fixed costs. There's costs that vary with volume. There are embedded costs. They're used to serve customers or whatever. And then the Commission allocates the revenue requirement out to the various customer classes based on these cost of service studies. Now we're to what is going on today. Now costs have been allocated to service classifications one and two, the small, the residentials and small business customers. And what the Commission found was the nature of these costs, the customer costs and the distribution costs, are fixed costs. The gas costs are not. They're volumetric. And they have their own rider, the PGA, purchase gas adjustment costs, rider two. But the question then becomes if these are fixed costs, should they be covered through a fixed charge? Or because they have been recovered through a combination of fixed and volumetric, do we move straight to fixed variable, which no one really recommended except for the company, except in the event that rider VBA is not taken up, you wouldn't want to recover all fixed costs volumetrically because that makes the utility revenue requirement of a fixed cost. Well, these are variations in usage, which become about economic situations or weather situations or the conservation situations that we're talking about. So the only point I'm going to make in this part before I turn to the retroactive rate making is that the Commission probably could. It didn't decide to do it in this case. But it probably could take all fixed costs and recover them through fixed charges. It could take the revenue from that class, divide it by the number of customers, divide that by 12 and say that's your customer charge. And then the only volumetric component of their rates would be what they pay for gas. That's still the largest factor in their rates, cost of gas. But the Commission at this stage of the game is now that the revenue requirement is done, there are certain aspects of goals and objectives of the Act that the Commission has to weigh. They pull against each other. There's cost causation. There's cost recovery concepts. But there are also customer understanding, customer acceptance of the rates. So if you had something that recovers fixed costs through fixed charge, that would tend to drive small-use customers off the system. And that shrinks the pool of customers that rates can be recovered from. It would also tend to lower the incentive to conserve because that's what volumetric rates do. You can cut back on your usage and your rates go down. And so there are valid rate design reasons for the Commission not to choose to recover everything this way. And so based on the testimony of staff witness, Dr. Brightwell, they decided to go with a combination of fixed costs. The customer charges are close to 100% recovering fixed costs, but none of the distribution costs are being recovered in fixed costs. They're being recovered volumetrically. And that's the solution. Now, my point is the main complaint the Attorney General seems to have is that the rate design chosen by the Commission guarantees revenue recovery. If the Commission had chosen, for whatever reason, to recover fixed costs through fixed charges, and the testimony of staff is that customers don't vary very much from year to year, you're, in effect, doing the same thing. So the Act doesn't prohibit assuring the recovery of revenues, as they are saying. The Commission decided not to do that in that way, but it can assure the recovery of revenues as long as there's a true of them. One other thing, the AG is saying that, you know, there's no we're violating published rates. People don't know what it is. No, there's a rate published. Rider VBA is at, I think, record volume one, page 55. And it sets out a formula. In this case, in the city of Chicago, 13 millisecond. They said, you know, when you set rates out, like, it's a formula. It's like they've been stated in dollars and cents. So that's all I would say. Could you help us a little on that? Because the argument is made that one of the statutory concerns that has to be addressed, and you're suggesting that all these have to be balanced, but one of them is understandability. And there is the argument that for most consumers who want to be frugal, who want to be wise, who want to be energy conserving, they would be shocked to know that if they do all those things, they will pay more. I think that's the argument that the AG is making. So how does this consumer understandability factor play in? Well, they will still conserve because they're receiving the benefit of the volumetric rate, and if there's an adjustment, it's going to come back volumetrically, too. So the ones that use the least amount of gas are still going to have the lower charge. And it's kind of like getting an estimated bill one month. And you don't know exactly what the cost is, but then it's trued up, and you get a bill later that trues it up. This lets you know, here's what your volumetric charges are for gas. Here's what your volumetric charges are for your distribution charge. At the end of the year, though, there's going to be an adjustment, and you know that it's coming. So I think the customers can understand that. I don't think that there's been a hue and cry against this rate based on understandability. How does the consumer know it's coming? It's published. Well, it's part of the formula. And then at the end of the year, there's a trued up number that's then flowed over the next year, and I think Mr. Iduk probably explained it better than I'm doing. Quickly, with regard to retroactive rate making, they did waive the argument. They had made it before. They made it explicitly. They made it in one portion of the case on something else. They just put all their eggs in one basket and hoped that the court's decision in Commonwealth Edison, which is single-issue rate making, would carry the day, and then they reconsidered it. There's no really good reason for the court, I think, to reach this. Petitions we're hearing are jurisdictional. It would be anomalous to say they could just leave off one of their arguments, having made it before, and still court could take jurisdiction over the argument. Also, retroactive rate making is not, from the Citizens Utilities Company case,  In that case, the commission was correcting an error in that relating to a contributed plant of a water utility. It went back and reduced the rate base based on what they thought they should have been doing, commissions should have been doing in years past. In the utilities context, back to the forfeiture for a minute, in the utilities context, wouldn't case law suggest that they did enough to preserve it here? I would say no, because they didn't mention retroactive rate making anywhere in it. The fact that there was a separate case before where they did raise it, the commission isn't subject to res judicata, and the members change. There's two different members on the commission. Thank you, Your Honor. Thank you. Good morning, Your Honors. Theodore A. Dukas on behalf of Applebee's, the People's Gas Light and Co. Company, and North Shore Gas Company, which I'll refer to as People's Gas and North Shore, are the utilities for the sake of brevity this morning. Following up from where Mr. Kelleher left off, addressing the question on the publishing of Rider VBA as a rate and whether or not it's prospective or retroactive. Just to help, Your Honors, yes, Rider VBA is a formula. It is a written rate that is published as a tariff, publicly, can be looked at by the public. Every year, these adjustments, which Attorney General's Counsel has said, keeps referring to them as surcharges, but they're adjustments. Actually, they've returned approximately $24.5 million over the course of Rider VBA being in effect as a pilot and permanently. So it's entirely fair to call this a measure that's meant to guarantee profit. But in any event, every April, the company is required by that tariff to make a filing with the Illinois Commerce Commission, which is a public document, sets forth amounts of gas used, the charges, the rates, actually shows that, again, far from guaranteeing profit, the operation of Rider VBA, with the operation of Rider VBA, their actual rates of return and return on equity have still been, every year, coming in below what has been authorized by the commission as that approved return level. And just pointing out, in fact, I'm going to point out that there's been more adjustments returning over recovery of the revenue requirement to consumers than collections. In 2013, which I can point you to the Supplemental Appendix, page 110, for the record, it shows that because of the abnormally cold winter and the effect that unforeseeable weather had on gas usage, but for Rider VBA, the company would have actually earned in excess of its authorized return. With Rider VBA in place, it prevented that over-recovery, and the actual return earned was below the authorized rate of return. So I hope that the publication of this information, the adjustments under Rider VBA are applied prospectively. That is why the notice and publication requirements of the Public Utilities Act are met. Turning to the two points, Your Honors, the Rider VBA does not violate the principles of rate of return regulation as suggested by Epon's. It does not change how that revenue requirement are set for the utilities in a rate case. Revenue requirement is still set in the full rate case by the commission, examining all the components of costs, the rate base, and a reasonable rate of return. And once those revenue requirements are set, Rider VBA does not change those revenue requirements. It doesn't provide for the recovery of any costs outside of a rate case. And as I was just discussing, Rider VBA does not guarantee any level of profitability for the utilities or that they will be profitable at all. And in turning to that determination of a revenue requirement, counsel for the appellants did mention the concept of lease cost that comes from the Public Utilities Act, Section 1-102, and putting aside the fact that there's a line of cases that says that this is prefatory or preamble language that's not operative. You know, that was just the General Assembly saying these are our findings and the general goals they wish to accomplish through the Public Utility Act. Putting that aside, whether or not a utility services lease cost, well, that's what's done would be applied when the Commerce Commission has determined the revenue requirement. That is where the Commerce Commission is taking a snapshot of that test year and seeing what the utility's costs are that are approved for recovery, examining them all in the context of those costs, the investments, and the rate of return to be applied to those investments. So if the concept of lease cost is a requirement under the Public Utilities Act, it's in that first step where the revenue requirement is set that that principle applies, because that's where the costs to be recovered are determined. Now, going forward in that second step, collecting that revenue requirement, well, the principle of lease cost has already been addressed by the setting of the revenue requirement, but the fact that RIDER VBA is symmetrical and it adjusts to make sure that that revenue requirement is not over or under collected, the fact that it prevents over-recovery of the revenue requirement when factors outside of the control of the utility, like weather or economic conditions, cause more gas to be used than had been forecasted when determining those charges, well, that actually would be in line with the fact that there should be a lease cost service because it's preventing the utilities from recovering a windfall because of the happenstance of weather. And likewise, turning to the single issue, and before I move on from there, Your Honor, I'd ask for some direction in what cases should you look at when trying to determine, in that second step, the rate design step, the commission has acted appropriately. Well, I would suggest, Your Honors, to start by looking a few years back at the Scheffler case and where it confirmed what it had said earlier in Village of Apple River, that the Commerce Commission is the expert body that this General Assembly has put the authority and the obligation to set rates, examine the technical aspects of utility operation, whether the services are adequate, the rates are correct. That is what this Court found in Scheffler has been vested with the Commerce Commission. So I would start there. I would also look at the case of Cerro Copper Products versus ICC 83 Illinois 2nd 364, where this Court had said that issues of rate design are uniquely within the Commerce Commission's discretion. And modifications of the Commerce Commission's rate design determinations are especially to be disfavored on an appeal. So I would suggest that the Court start there with cases addressing the rate design point. Let me ask you a question about your opponent suggested we look at BPI. And it certainly seems that in earlier cases, the issue of the unknown, maybe, the allocation of risk runs through a number of these cases. So in other words, the required revenue is established, but then, of course, we understand whether and all sorts of things can interfere with knowing exactly how much the cost is going to be recovered. And those earlier cases seem to be struggling with that. I think what the Attorney General is arguing that what has happened here is that any sense of risk has been removed from the utility and placed solely on the consumer, and that that's why this is inbound. Could you address that? Yes, Your Honor, in a couple ways. First of all, that risk is factored in when the Commission determines that approved rate of return to be applied to invested capital. And what the Commission has found, and when they're making the determinations in that step, the revenue requirement step of the case, they factor in that utility may have a lowered risk because it has this revenue decoupling mechanism, and it will authorize and has, in subsequent rate cases and orders, has addressed that. Originally it had a adjustment, like a 10 basis point adjustment that it applied to the revenue requirement because they wanted to adjust for that risk of being lowered for the utility. And in the latest rate case order issued in early 2013, the Commission did not apply that because it found that when it was looking out at all the utilities that it was comparing as a proxy group to determine what's a reasonable rate of return, it found that a significant portion of them already had decoupling, so that reduced risk was factored in to their rates of return and their costs of capital. So it's already built into the process, this reduced risk. And I would also point out to the point that customers don't have any incentive to conserve. Well, that's just not true, not only because, as Mr. Kelleher said, Rider VBA and other charges are still charged on a per unit basis of gas, so the Rider VBA, when it's not an adjustment downward, it's an adjustment upward, there would still be incentive to not use more gas because you're saving money. But that's not really where conservation, where customers save their money and they have incentive. The largest portion of a gas customer's bill is the cost of gas, which is a pass-through. That's the largest portion of that gas bill. And if they want to really save money, they'll use less gas because they won't be paying for the gas that they don't use. And that incentive still remains. I believe there's a problem with confusing between the costs of gas, which is not what utilities' revenue requirement is supposed to be recovering. It's supposed to be recovering for the fact that it has this distribution system that's on demand and has invested this capital that needs to be recovered. That's what the revenue requirement is about. Cost of gas is a pass-through, and customers will still have an incentive to conserve. In my time remaining, I just want to point out that counsel for the attorney general said, let's talk about that, you know, in our briefs that, you know, I do believe there is a dispute by this court and Citizens Utility Board and by the appellate court below that riders are not necessarily single-issue rate making. And there's no cost being passed through by Rider VBA, so the test that they want applied should not apply to this rider. Thank you, Your Honors. Thank you. Thank you, Your Honors. At the outset, one quick correction I want to make from my earlier talk, when I cited the energy efficiency statute at Section 8-401 of the Public Utilities Act, it's Section 8-104, transposed some of the many numbers floating around in this case, and I apologize for that. Your Honors, turning to understandability of rates, the fact that it is published that Rider VBA will change your rates at a later date doesn't make your rate understandable. It doesn't let you know what your rate is going to be when you use the gas and avail yourself of the utility's gas delivery service. You don't know. It's not understandable. The fact that knowing that it's going to change in the future just means that it's uncertain. And that is contrary to the notion of prospective rates and published rates and publicly understandable rates. They're at the foundation of this whole rate-making process. The utilities and the commission, especially, I guess, the commission today, argues that all this does is recover their fixed costs. But the commission at page 187 of its order rejected the premise that the demand for gas does not, that all costs are fixed, that all costs are fixed. They rejected the premise that as demand for gas decreases, there is no effect on fixed costs. That's because some of the costs, as gas demand decreases, as usage decreases, there are fewer operating costs that are necessary. So it's not a fixed cost. Recovery of a revenue requirement is not fixed. It does change according to usage. Additionally, and I'm sorry for skipping around, back to the understandability, they argue that there's been no hue and cry from the public because these aren't understandable. I would say to the contrary, the people of the State of Illinois and the Citizens Utility Board are both telling you they're not understandable. I think that's probably the most effective hue and cry you can get, that these rates don't make sense to the consumer at the time they're using gas. Retroactive rate making, retroactivity in rate making, is not simply about error correction. To be sure, there are cases, there is a case, the Citizens Utility Board, that dealt with going back and correcting an error in the rate base. It determined that, okay, the rate base before was too high, we're going to go back and reduce it. But BPI, Illinois Bell, they didn't go back and correct a rate base. They went back and said, you recovered, the revenues you recovered are too high, so we're going to order you to do refunds. It's not a correction. That is the same type of analysis that Rider VBA permits and, in fact, requires now. You over-recovered, you under-recovered, go back and fix it. That's exactly the same type of thing that Rider VBA affects. And, again, it does alter the rate paid. It does alter the rate paid by the rate payer. Additionally, it is true that Rider VBA does not guarantee profits. We're not arguing that it guarantees profits. It's also true that Rider VBA does not change the revenue requirement found by the commission. We're not arguing it does. What Rider VBA does do is guarantee a revenue requirement that is not supposed to be guaranteed. There is supposed to be an element of risk for which they are compensated through profits. There is supposed to be obligations to manage your business responsibly. So if customer usage does go down, then you make other changes in your business, just like any free market business would. Rider VBA does change, does not change the revenue requirement, but it does actually change the rate people obtain. A posting counsel suggests that in determining, in the first step, in determining the revenue requirement, this shift in risk has been factored in. Is that true? We don't know. It is, yes, in subsequent rate cases, once the fact of Rider VBA became certain, it is true that the amount of risk factored, it has been lowered because of the guarantee of the revenue requirement. So ultimately, after it's operated and after Rider VBA has become there, that is true. There is some, but there's certainly no indication that there's any kind of corresponding or equality in terms of the reduction of the risk. Basically, in other words, it's not clear that their allowed profit is lowered in direct correspondence to the lower risk they have because their revenue requirement is guaranteed. And in any case, the basic point is that still customers are suddenly bearing this responsibility that they achieve their revenue requirement. But that customers aren't supposed to bear a responsibility for a utility to obtain its revenue requirement. Customers don't have an obligation to use enough of their service so they make what they projected they would make. But if I understand other opposing counsel's argument, the risk would be higher without Rider VBA and therefore the rates would be higher and the customers would pay it anyway. Is that correct? That's not correct. Rider VBA works to either retroactively increase or decrease rates. Right. So it has not had, and it has not always decreased rates. In fact, because of the surcharges, it creates greater rates than otherwise were initially allowed when determining how to meet the revenue requirement because of the surcharges. But if I understood counsel's argument, because the element of risk, some of the element of risk is removed, the rates actually may be lower to guarantee the revenue stream than they would be if Rider VBA did not come into play. That is theoretically possible, though the evidence also shows that the rate of return the companies get with Rider VBA is higher than the rate of return they get without Rider VBA. And that's cited at page 17 of our reply brief. So in the end, Rider VBA still, you know, on at least the year analyzed there, Rider VBA does actually have an effect on their actual rate of return. So yes, while it may be factored into setting rates at one point, because of the retroactive change, refund, surcharge, whatever, there's still this impermissible variability in that rate, even if it might be initially lower as a result of the supposed certainty or less risk that it creates. The Commerce Commission or the company says they've refunded 24.5 million, I think. Do you have figures as to how much rate increase or additional amounts? Are those proper factors we should consider? Those, well, I don't think those are proper factors that you should consider in this case, because this is presenting legal questions about whether this is permitted. Now, it's true, they say that they refunded that much money they're going to. As a result of a historically, epically bad winter. Whereas in other years that preceded it, when they had mild winters, they're imposing surcharges. So anytime you take the kind of anecdotal snapshot that they offer, because of how the limited amount of time that Rider VBA has been in effect, and the fact that we had a complete outlier weather for this last winter, I would offer that it's improper to draw conclusions from that, because it's too variable and the sample size is too small. Instead, the important factors are returning to whether, does this change rates later? Is this not publicly understandable? Does this violate lease costs? And is this a permissible single-issue rate making? Is this a permissible Rider? And you heard them argue again today. They argue that because we don't meet the ComEd Rider test, then the Rider test doesn't apply. But that's not true. That's not true. Riders are single-issue rate making, and they're only allowed in certain instances to pass on external costs that are outside of the utility's controls in a way that does not change the rate of return. Here, this is no pass-through cost on some externally imposed, no pass-through of a cost that's been externally imposed, such as a franchise fee imposed by a government, or an environmental cleanup fee imposed by a government. There's nothing external, there's nothing external that is out of their control that they are recovering through this. And so far as they argue things like weather they can't control, that's true. But they forecast it as part of the initial rate determination, and they are compensated, and the variability in weather is taken into consideration already. There's nothing external to the rate-setting mechanism that they're being compensated for. Thank you. Thank you. Thank you. Case number 116005, people at Sir Elisa Madigan et al. versus the Illinois Commerce Commission et al. will be taken under advisement as agenda number 12. Mr. Legner and Mr. Kelleher and Mr. Dukas, thank you for your arguments today. You are excused at this time.